WASHINGTON LIBBY *v.* UNION NATIONAL BANK *et al.*

and

ADELIA R. COOLBAUGH *et al. v.* UNION NATIONAL BANK.

*Filed at Ottawa May 14, 1881—Rehearing denied September Term, 1881.*

1. NATIONAL BANK—*right to acquire real estate.* A national bank may purchase real estate to secure satisfaction of a debt due it, even though it costs a considerable sum over and above the debt, and the title to the land is acquired from another than the debtor, and may take the title thereto in the name of its president for its use.

2. AGENCY—*authority of president of bank.* Where the president of a bank, besides his official authority as such, was the general agent and manager of the affairs of the bank from its organization through a long course of action, exercising the powers of a general agent with the knowledge and approval of the directors, it was *held*, that this fully warranted him in purchasing real estate in satisfaction of suspended paper or a doubtful debt due to the bank, whereby a portion of the debt might be saved from loss.  ·

3. SAME—*when principal required to pay agent's note given in his own name.* Where, after land conveyed in trust to secure a note due a bank was sold · without redemption under a prior incumbrance, the president of the bank bought the same land, taking a deed in his own name, for which he turned over the note due the bank, and gave his individual note and deed of trust for the balance of the price, and the court, on bill to foreclose the trust deed and cross-bill by the heirs of the president to require the bank to pay the note, found that the land was bought by the president, not for himself but for the bank, as its agent, to secure a part of the debt due it: *Held*, proper that the bank should pay the amount due, and thereby release the estate of the maker of the note.

APPEAL from the Appellate Court for the First District;— heard in that court on appeal from the Superior Court of Cook county; the Hon. S. M. MOORE, Judge, presiding.

Prior to December 4, 1873, the Union National Bank was the holder of four promissory notes, one dated September 15, 1873, at 60 days, for $5000, made by W. F. Windate and Samuel Smith; one dated September 16, 1873, at 60 days, for $10,000, made by the Swansea Smelting and Refining Company; one dated October 4, 1873, at 60 days, for $10,000,

made by the Swansea Smelting and Refining Company; and one dated October 4, 1873, at 60 days, for $5000, made by the Richards Iron Works. The notes of the Swansea Smelting and Refining Company were signed by Adam Smith, as president; that of the Richards Iron Works by W. F. Windate, as its secretary, and the name of Samuel Smith was signed to the first note by Adam Smith, as his attorney. All these notes were indorsed by Adam Smith, and Adam Smith & Son. The first two, dated, one September 15 and one September 16, were also indorsed by S. M. Nickerson. The notes bearing date, one, September, and two, October 4, were also indorsed by S. F. Windate. The name of "Samuel Smith, by Adam Smith, attorney," was also on the note of September 16, as an indorser.

These notes appear to have been discounted by the bank in the ordinary course of business. The notes of September 15, 1873, and September 16, 1873, were protested for non-payment on the 17th and 18th of November of that year.

Shortly before the 4th of December, 1873, an arrangement was made between Adam Smith, or Adam Smith & Son, of the one part, and the bank of the other part, to extend the time of payment of this indebtedness to the bank; and to that end four other notes were given to the bank, for like amounts respectively, dated respectively at the maturity of the original notes,—that is, one on December 17, one on December 18, and two on December 4, 1873,—each payable six months after date, and signed by Adam Smith, payable to Benjamin Merrill; and these notes were secured by a pledge of 300 shares of stock in the Swansea Smelting and Refining Company, issued to Adam Smith, and by him assigned, and these notes were at the same time secured by a trust deed made by Pierson D. Smith to Benjamin Merrill. The bank retained also the four original notes.

The deed of trust to Merrill was acknowledged December 3, 1873, and recorded December 4, and conveyed (as security for the second class of notes) the east half of the north-east

quarter of the south-west quarter of section 35, town 39, range 13, containing 20 acres, more or less.    Upon a subsequent survey this tract was found to contain about 22 acres.

At the time of this transaction Washington Libby held a deed of trust (which was recorded in December, 1871,) upon the east half of the south-west quarter of the same section, made to Freer, as trustee, to secure to Libby a debt of $40,000; and a second deed of trust to Freer, recorded in October, 1873, to secure Libby another debt of $30,000, both debts due from Adam Smith.

About the time when the bank accepted this deed of trust to Merrill the residue of the tract embraced in Libby's deeds of trust was incumbered, in parcels, by like deeds of trust, to secure debts to Miner T. Ames & Co., Bogle & Co., and to the Chicago and Rock Island Railroad Company, and also to E. F. Pulsifer & Co.

The deeds of trust held by Libby each contained powers of sale for foreclosure, without proceedings in court, and without redemption.

Some time in the winter of 1874–1875, Libby took steps to have the entire 80 acres embraced in his deeds of trust brought to sale under the powers therein contained.    It seems some question was raised as to the *bona fides* of his claims, and in January, 1875, to test this question, the holders of these subsequent incumbrances united in causing a bill to be filed by Miner T. Ames & Co.    Such a bill was filed, and a temporary injunction obtained forbidding Libby's sale; but soon after, on hearing of a motion for that purpose, that injunction was dissolved and the bill dismissed. In this proceeding the bank took part, and paid its proportion of the expenses and costs incident to the proceeding. Libby then proceeded to advertise and sell the property, and at the sale made by Freer, on March 15, 1875, Libby became the purchaser, and received a deed to him from Freer, the trustee, investing him with the title to the entire 80 acres.

Before this time this entire tract of land had been laid out into blocks and lots, streets and alleys, under the name and description of "Adam Smith's subdivision of the east half of the south-west quarter of section thirty-five (35), in township thirty-nine (39) north, of range 13, east of the third principal meridian;" and blocks 1, 4, 5 and 8, and lots 1, 2, 3, 4, 5 and 6, of block 9 of that subdivision, consisted of that part of the tract embraced in the deed of trust to Merrill, which was held by the bank.

After the sale by Freer to Libby, and some time in April, 1875, Libby conveyed these lots and blocks to William F. Coolbaugh (who was the president of the bank), and Coolbaugh gave to Libby a promissory note, signed with his name as maker, payable to Libby three years after date, for the sum of $22,000, with interest at 10 per cent per annum, payable semi-annually, and bearing date April 10, 1875, and to secure the payment thereof executed a deed of trust upon the property so conveyed to him by Libby, conveying the same to George C. Christian, as trustee. This deed of trust was acknowledged by Coolbaugh April 24, 1875, and was duly recorded. The consideration stated in Libby's deed to Coolbaugh was $55,000.

Coolbaugh died in November, 1877. In June, 1878, Libby filed the bill in this case to subject this property to sale, and to apply the proceeds to the payment of the note given him by Coolbaugh. The heirs and legal representatives of Coolbaugh and the Union National Bank were made parties defendant. The bill charges that the purchase of the property from him was in fact made by the bank, although the deed was made to Coolbaugh, and that the bank, as well as Coolbaugh, became his debtor for the purchase money, and asks a decree against the bank and against the estate of Coolbaugh for the amount of his note and unpaid interest. Answers were filed and issues formed, and the legal representatives of Coolbaugh also filed a cross-bill, claiming that the debt to Libby, evidenced by this note given by Coolbaugh

to Libby, is the debt of the bank, for which in equity Coolbaugh was really merely security, and asking that such be declared by the decree of the court, and that the bank be required to pay whatever balance, if any, shall be unsatisfied after the sale of the property in the deed of trust to Christian. The bank answered the cross-bill, and in that answer, as well 'as in its answer to Libby's bill, denies all interest in the transaction and all liability on account thereof.

The case was heard on the pleadings and proofs, and by the decree of the Superior Court of Cook county the cross-bill was dismissed for want of equity, and it was held that complainant in the original bill had no equity as against the bank, and that the amount due upon the note should be paid out of the assets of Coolbaugh's estate, and in default of payment the property in the trust. deed to Christian be sold. This decree, upon appeal to the Appellate Court by Libby and also by the legal representatives of Coolbaugh, was affirmed. From that judgment of the Appellate Court Libby appeals to this court, and so do the legal representatives of Coolbaugh. These two appeals are brought here upon one transcript of the records of the lower courts, and are here considered as one case.

Mr. WM. C. GOUDY, for the appellant Libby, after stating the facts of the case and commenting upon the evidence, made the following among other points:

Taking all the facts and circumstances together, they establish that the bank purchased the land from Libby through its duly authorized agent, Coolbaugh, and thereby became liable for the purchase money. Coolbaugh was not only president, but director of the bank. He was acting for the bank, and not for himself, and his knowledge was the bank's knowledge. *U. S. Bank* v. *Davis*, 2 Hill, 455; *Bank* v. *Town of New Milford*, 36 Conn. 93; *Smith* v. *Livingston*, 111 Mass. 342; *National Sec. Bank* v. *Cushman*, 121 id. 490; *The Distilled Spirits*, 11 Wall. 350.

National banks have power to purchase real estate to secure debts due to them. U. S. Rev. Stat. sec. 5, 137; *Mapes* v. *Scott,* 88 Ill. 352.

Evidence of powers habitually exercised by the president or cashier of a bank, with its knowledge and acquiescence, defines and establishes as to the public those powers, provided they be such as the directors of a bank might, without violation of its charter, confer on such officer. *Merchants' Bank* v. *State Bank,* 10 Wall. 604.

To hold that the public may not safely confide in the existence of powers which by charter can be lawfully delegated, and which are openly exercised, but must investigate and find if those powers have been the subject of by-laws or vote, and act accordingly, would not only suspend the business of commerce, but tend to make transactions with corporations a snare and a cheat. *Bank of the United States* v. *Dandridge,* 12 Wheat. 64; *Minor* v. *Bank of Alexandria,* 1 Pet. 46; *Nicoll* v. *Am. Ins. Co.* 3 Wood & M. 530; *Smith* v. *Hull Glass Co.* 8 C. B. 868; 11 id. 897.

So far as the public are concerned, it is immaterial whether the powers thus exercised are in disregard of the by-laws of the corporation or not, provided they are within the corporate powers conferred by the charter. *Agar* v. *Ath. Ins. Co.* 3 C. B. (N. S.) 725; *Royal Bank* v. *Tarquand,* 6 Ellis & Black, 327; *Prince of Wales Ins. Co.* v. *Ath. Ins. Co.* 3 C. B. (N. S.) 757.

It is not necessary, to constitute a general agent, that he should have done before an act the same in specie with that in question. If he has usually done things of the same general character and effect, with the assent of his principals, that will be enough. *Commercial Bank of Erie* v. *Norton,* 1 Hill, 502; *Watkins* v. *Vince,* 2 Starkie, 324.

Mr. J. R. DOOLITTLE, for the appellants the administrators of the estate of Coolbaugh:

The Swansea notes for $30,000, which were a part of the consideration of the deed from Libby, belonged to the bank,

and Coolbaugh had no right to use the funds of the bank in a private speculation for himself. Perry on Trusts, secs. 194, 195, 200, 202, 209. And if he did, a resulting trust would arise by operation of law. Perry on Trusts, secs. 124–126.

As to the binding force of Libby's agreement with Coolbaugh, although made without any money consideration, see *Thayer* v. *Meeker,* 86 Ill. 473; *Mathison* v. *Prescott,* id. 493.

A court of equity has exclusive jurisdiction to require the bank, the primary debtor in equity, to indemnify the estate of Coolbaugh, the surety, against the liability upon the note to Libby, and to compel the real and principal debtor, before payment by the surety, to provide for the payment of the debt, and thereby to save the estate from its legal liability,— all of which the bank is bound in equity to do. 11 White & Tudor's Leading Cases, part 1, 281–283; *Wilks* v. *Harper,* 2 Barb. 338; *Antrobus* v. *Davidson,* 3 Meriv. 569; Adams' Eq. secs. 270, 502; Willard's Eq. 109.

Suppose Coolbaugh had taken the agreement of the bank to indemnify him for signing that note, no one could doubt Libby's right in equity to call upon the bank as a principal debtor. So, too, when the bank, from its relation of *cestui que trust,* is in equity bound to indemnify him, Libby's right is the same. *Claythorne* v. *Swinburne,* 14 Ves. 160; Willard's Eq. 110, 111; *Curtiss et al.* v. *Tyler & Allen,* 9 Paige, 432.

That the bank had the power to acquire the title to the land, see *Kansas Valley Nat. Bank* v. *Rowell,* 2 Dill. 371; *Thompson's Bank Cases,* 353; *First Nat. Bank* v. *Haire,* 36 Iowa, 443; *Orrin* v. *Merchants' Nat. Bank,* 16 Kan. 341; *Upton* v. *Nat. Bank of South Reading,* 120 Mass. 153; *Union Nat. Bank of St. Louis* v. *Matthews,* 98 U. S. 621.

Messrs. McCoy & Pratt, for the appellees:

When the principal is known, and the agent contracts in his own name, the principal is not bound. *Patterson* v. *Gondasequi,* 15 East, 62; *Addison* v. *Gondasequi,* 11 Taunt. 573; *Thompson* v. *Davenport,* 9 B. & C. 78.

Parol evidence can not be heard to discharge an agent who has bound himself in writing, as that would be to change the written contract by parol. *Stackpole* v. *Arnold,* 11 Mass. 27; Smith's Leading Cases, vol. 2, 366, 377.

If an agent contracts in his own name, and his principal afterwards becomes known, the party dealing with the agent may elect which he will hold, the principal or the agent; and such election to hold one discharges the other. Smith's Leading Cases, vol. 2, 375.

An election is shown by accepting the agent's note, or suing him, or charging the goods to him. Smith's Leading Cases, vol. 2, 376; *French* v. *Price,* 24 Pick. 14; *Jones* v. *Ætna Ins. Co.* 14 Conn. 501.

We also claim that Coolbaugh had no authority to bind the bank by the purchase shown, and further, that the bank had no power to make such a purchase.

Mr. Justice Dickey delivered the opinion of the Court:

Several questions are presented for our consideration by this record. The theory of appellants is, that the bank, having a claim against Adam Smith and others of over $30,000, inadequately secured, accepted the deed from Libby to Coolbaugh in payment of that demand, and to accomplish that end agreed to pay, in addition to the amount of this demand, the sum of $22,000 in money, to be paid in three years, with interest; that the title to the land was taken to Coolbaugh to hold and sell for the bank, and hence the debt to Libby is really the debt of the bank.

The first question naturally arising is, whether the National bank has power, under its charter, to buy and hold real estate for such a purpose. If the nature of the transaction be in truth such as is claimed by appellants, there can be but little question of the power of the bank in this regard. It is provided by the act of Congress, that a national banking association may purchase, hold and convey real estate for certain enumerated purposes, and "for no others." Among the

purposes enumerated is included such real estate "as shall be conveyed to it in satisfaction of debts previously contracted in the course of its dealings." If, therefore, the *real* purpose of this conveyance was to secure the satisfaction of the indebtedness evidenced by the Adam Smith notes, it was entirely competent for the bank to make the purchase in question.

This question was discussed in *Mapes et al. v. Scott et al.* 88 Ill. 355, and by the views there expressed the power of the bank to purchase and hold real estate in the manner claimed in this case seems to be beyond question. If in this case the subject of this purchase had been laid before the directors of the bank, and Mr. Coolbaugh had been directed to buy off Libby's prior and superior claim at $22,000, and by an arrangement with Smith and Libby to surrender to Libby, for Smith, the $30,000 claim of the bank against Smith for a clear title to this land, to be conveyed to Coolbaugh for the benefit of the bank,—and all this for the purpose of securing in this way the payment of this $30,000 claim,—we imagine none could be found to deny the capacity of the bank to thus purchase real estate for the satisfaction of a debt contracted in the ordinary course of business.

The next question in order seems to be whether Mr. Coolbaugh had authority to act for the bank in this regard, so as to make his acts the acts of the bank. It would seem there can be but little doubt upon this question. Coolbaugh was not only the president of the bank, clothed with official authority as such, but he was the general agent and manager of the affairs of the bank, and had been from its very organization. This the proof shows abundantly. His powers, as shown by a long course of action known to and acquiesced in and evidently approved by the directors, fully warranted him in accepting in satisfaction of suspended paper any valuable thing which, in his judgment, it seemed wise to accept. It is strenuously insisted, because there is no special grant of such power to him, as president, found in the by-laws, that he had in fact no such power. There are many things done

daily in every bank which are in fact and in law the acts of the bank, and of which no mention is made in the by-laws. Some officer or agent or employee of the bank receives, daily, large sums of money on deposit, for which the bank at once becomes liable, and yet no mention is made in the by-laws of any power in any officer or agent to receive such deposits. Had Coolbaugh accepted from Libby a draft on New York, payable to the bank, for $55,000, in satisfaction of these Adam Smith notes, (or Swansea notes, as they are sometimes called,) or in purchase of them, and had he paid Libby for the same, in addition to the notes in question, $22,000 from the cash of the bank, or had he given instead to Libby the promissory note of the bank for that sum, there could have been no question as to his acts in that regard being the acts of the bank, and by which the bank would have been bound. The whole course of business of this bank, as managed by Mr. Coolbaugh for years, shown by the proofs, could leave no doubt about this. It is not perceived that the fact that real estate was accepted, and not a draft, can make any difference in the result.

We are, therefore, brought at last to the question whether the allegations of appellants in this regard are true, in point of fact. This the appellee most strenuously denies. No question is made that the taking of the original notes, in September and October, 1873, was done by the bank; nor is it denied that the bank, through Coolbaugh, about December 4, 1873, extended the time of payment upon this indebtedness for six months, retaining the original notes and taking in addition four other notes, and as security to them the pledge of the shares in the Swansea company and the deed of trust to Merrill upon the land in question. That transaction of December is conceded to be business transacted by the bank; nor is it contended that the co-operation with Ames and others in the injunction suit against Libby, in January, 1875, for the purpose of relieving the claim of the bank upon this land from Libby's prior lien, was not the act of the bank.

All this was conducted and controlled by Coolbaugh, in behalf of the bank.

The contention relates to facts occurring after the injunction suit was ended. Counsel for the bank state their theory of the case as follows: "After the sale under the Libby trust deed, Adam Smith induced Coolbaugh to purchase the land in question for the benefit of Smith, and as an inducement to this end Smith agreed that he would pay accruing interest upon the purchase money note; that he would sell the land before the principal should mature, and out of the proceeds of such sale Mr. Coolbaugh should retain all his disbursements, and if anything remained, it should be applied in liquidation of the debt of Adam Smith to the bank."

This statement we regard as very near the truth, but not the whole truth.

Coolbaugh had the promise of Libby, made before the sale to Libby, that the bank might have this part of the land at $1000 an acre. Had he consummated that purchase, the bank would have held the title, subject to redemption by Smith, on payment of the money paid to Libby and the amount of the notes given to Merrill. To cut off this equity of redemption by Adam Smith would have required a foreclosure in court, or another sale under the Merrill trust deed. The land was considered worth from $2000 to $3000 an acre, that is, from $44,000 to $66,000. Coolbaugh, in his conversation with Merrill, estimated it at $44,000. But the market was dull, and to realize cash at a fair price seemed to require that the land should be held for a while. We agree with counsel for the bank in saying: "Adam Smith induced Coolbaugh to change his original arrangement with Libby, and instead of simply buying in for the bank the outstanding title of Libby for $22,000," induced Coolbaugh to purchase "the land,"—the absolute title to the land,—by adding the notes of Smith (called the Swansea notes), and by substituting, instead of $22,000 in cash, a note for that amount at three years, at 10 per cent interest. But we would add, that he

induced him to purchase for the bank. We agree with counsel that this arrangement was intended to be "for the benefit of Smith," but we think it was intended also to be for the benefit of the bank. Smith was to be benefited by getting up the notes on which he was liable to the amount of about $33,000, which was an object no doubt desirable to him. Coolbaugh regarded the personal liability of the makers of the paper and stock of the Swansea company as of no value to the bank, but thought that Smith was an expert and skillful real estate operator, and was willing in behalf of the bank to surrender this paper (which he considered of no value) and take the hazard of Smith's being able to pay the accruing interest on the note to Libby, and finally to discharge the principal by sales of the property in parcels, and in the end to refund to the bank at least two-thirds of what the bank had lost by the depreciation of the Swansea paper; and we agree with counsel in saying, that "as an inducement to this end, Smith agreed that he would pay accruing interest upon the purchase money note" to Libby, and "that he would sell the land before the principal should mature, and out of the proceeds of such sales Mr. Coolbaugh should retain all his disbursements;" but we would add to the statement that this meant "all of his disbursements" for the bank; and we agree with counsel in saying that what remained of these proceeds, after paying the Libby note and the incidental disbursements, was to "be applied in liquidation of" the amount of "the debt of Adam Smith to the bank," which, by the arrangement, was turned over to Libby "for the benefit of Smith," and thus the bank, by this purchase, was to obtain in part satisfaction of a debt originally contracted in the ordinary course of business.

The question in dispute is thus narrowed to the inquiry whether Coolbaugh's acts in this purchase from Libby constituted a purchase by Coolbaugh personally, for his own profit or with a view of aiding Smith as a friend, or whether they constituted a purchase by the bank, as a means of getting

part satisfaction of a debt which had become desperate. What is the evidence bearing on this question?

The contention relates to facts which occurred after the termination of the injunction suit.

Libby testifies that after that, and before the sale at which he acquired the title to the entire 80 acres, in a conversation with Coolbaugh, he promised that if he should get the title at that sale the bank should have the Adam Smith land at $1000 an acre, or at what was the cost of the same to Libby, if it did not sell for more than Libby's claim, and that after the sale he learned from Adam Smith that Coolbaugh would be willing, on behalf of the bank, to give the Adam Smith notes, or the Swansea notes as they were sometimes called, and $22,000, for a deed to the land, and that he went to the bank and there consummated the trade upon the terms mentioned. He says in his testimony, that Coolbaugh in making the trade said he was making it *for the bank,* and so he accepted and received the Swansea notes, and Coolbaugh's note secured by the trust deed upon the land conveyed. He further testifies that after he had received all these securities, at the request of Coolbaugh, and with the consent of Adam Smith, who had an interest in the purchase of the notes, he left the Swansea notes in the custody of the bank, Coolbaugh saying: "They are subject to your order, Mr. Libby; you can have them any time you want them." He further says the original arrangement was that the bank was to have this land at $1000 per acre, and that the arrangement to put in the Swansea notes was an arrangement brought about by a bargain made between Smith and Coolbaugh. These Adam Smith notes, or Swansea notes, were not considered of any value in themselves by Libby at that time.

Adam Smith testifies that after the sale to Libby the witness saw Coolbaugh, and suggested that in order to secure the bank he had better buy this 20-acre tract from Libby, and turn in the notes of the Swansea company, amounting to $30,000, and he would try to sell it for him and bring him

out; and that he, the witness, brought Mr. Libby to the bank, and he and Coolbaugh made a trade, whereby Coolbaugh "was to buy for the bank 20 acres, and turn in these Swansea notes as first payment, and pay $22,000 on time, to be secured on the 20 acres as a balance of purchase money." He swears "Coolbaugh said he was doing this to secure the bank," and that "the reason he did not have the land deeded directly to the bank was, that he *did not want it to appear that the bank was carrying* so much *real estate."* The witness further testified that after the trade was closed Coolbaugh requested Libby, in the presence of the witness, that he would leave those Swansea notes in the bank *for a time;* that they should lie there as *his* property, and that he said he would give Libby any kind of a receipt he wanted.

Merrill testifies Coolbaugh consulted the witness about taking this land of Libby, and said: "If there is any security in the property, I want to get additional security," and said he thought "it would be worth to the bank" possibly $1000 an acre. The witness adds it was generally understood the equity of redemption over what was going to Libby was $1000 an acre, or more, and Coolbaugh said that in this transaction he wanted to get more security, for the parties on the notes had become worthless. More security for what? This declaration could refer to nothing except further security for the claim of the bank growing out of these transactions with Adam Smith.

The testimony of Donnersberger shows that about that time Coolbaugh was in conference with some gentleman, whom the witness did not know, about this property, and in connection with this $30,000 claim of the bank, with a view of securing or saving in part this $33,000 claim.

This testimony seems to be abundant to show that this transaction with Libby was a transaction *for the bank,* although transacted in form in the name of Coolbaugh. Considering all the circumstances developed by the proofs, we have no doubt whatever that this is the real truth. No

witness pretends to contradict the direct and explicit testimony of Adam Smith and of Washington Libby, supported and corroborated as it is by the testimony of Merrill and Donnersberger.

It is contended that certain circumstances developed in the testimony tend strongly to show that this purchase from Libby was made by Coolbaugh either as a personal speculation, or in trust for Adam Smith. When carefully analyzed and compared, we find nothing in them incompatible with the idea that the purchase was in substance and in fact a purchase by the bank,—so intended by Coolbaugh, and so understood by Libby, and also by Adam Smith.

Let us consider some of these facts on which counsel for the bank seem chiefly to rely.

It is said "no officer, director or stockholder of the bank ever heard of this contract;" that although Libby may have promised the bank the privilege of redeeming at $1000 an acre, still this is not a redemption, but on its face a purchase out and out, and entirely in the name of Coolbaugh, without mention of the bank in any of the papers; that no memorandum or entry of any kind relating to the transaction was made in any of the books of the bank; that for two years and a half Coolbaugh personally paid the taxes on this land and the interest on the note given to Libby, except the first installment of interest, and that was paid by Adam Smith; that after this purchase from Libby, Coolbaugh, in his own name, joined Libby in vacating the plat before that time made of this 80-acre tract, and in making a re-subdivision of the land, under the name of "Coolbaugh and Libby's Subdivision;" that the Adam Smith or Swansea notes were retained in the bank, and this for no possible end, if appellants' theory be true; that if this property had been taken in payment of the Adam Smith and Swansea notes, they should have been canceled; that the note given by Coolbaugh to Libby was made payable at the Traders' National Bank, and not at the Union National, for the purpose of

concealment, as is suggested, from the officers and employees of the Union National; that this note was put at three years, at 10 per cent, when the bank had plenty and a surplus of money on hand, and was paying no interest on money, save to country banks, and that not over 3 per cent; that this land was by direction of Coolbaugh omitted from the list of the lands of the bank; that no part of Coolbaugh's disbursements for interest or taxes were ever charged by him against the bank, or collected from it.

To our minds all these circumstances are in complete accord with our view of the true character of this transaction.

It is well known, as a part of the history of that time, that by a revulsion in monetary affairs, which occurred in the fall of the year of 1873, most of the banks in this country found it necessary, in their efforts to avoid loss, to resort to the real estate of their debtors for security. It is equally well known that it was regarded as injurious to the credit of any bank to have it known that it was carrying any considerable amount of real estate, and that it was a common device among bankers, when it was necessary to resort to real estate for security, to have such real estate carried upon the records not in the name of the bank, but in the name of some person in whom confidence was placed. It is plain that considerations of this kind had an influence on this transaction long before the sale of this land by Libby, for we find that in December, 1873, when Adam Smith induced Mr. Coolbaugh, in behalf of the bank, to extend the time of payment of this $30,000 debt, the notes for that purpose were not made payable to the bank, but were made payable to Merrill.

There is, then, no reason to discredit the testimony of Adam Smith when he swears that Mr. Coolbaugh assigned as " the reason he did not have the land deeded directly to the bank, that he did not want it *to appear* that *the bank* was carrying *so much real estate.*" To avoid this, the land was deeded to Coolbaugh instead of to the bank, and the note for the money to be paid to Libby was given by Coolbaugh

instead of by the bank; and for the same reason no memorandum of the transaction was made in the books of the bank; and for the same reason Libby was induced, with the consent of Smith, to leave in the custody of the bank the Swansea paper, or Adam Smith notes, that they might remain on the books of the bank as bills receivable, and that the stock certificates and Merrill deed of trust might remain "in the safe of the bank, where they were kept with other collaterals of the bank ordinarily," as Hippell swears they did; and for the same reason Coolbaugh paid the taxes, and also the interest on Libby's note, after Adam Smith failed to do so, and this without any charge for the same being entered on the books of the bank; and for the same reason, when it was thought best to vacate the old plat and plat the ground anew, Coolbaugh, and not the bank, joined with Libby in doing this, the fee of this 22 acres being vested at law in him; and for the same reason this tract was omitted from the list kept of the lands of the bank. The note to Libby was no doubt given at three years, and at 10 per cent interest, and made payable at the Traders' Bank, for the convenience of Smith, who had, as counsel concede, agreed to keep the interest paid, and to give time to realize the amount from sales of lots, without drawing upon the cash of the bank, for such a draft would at once make it *apparent* on the books of the bank that the bank was carrying this amount of real estate, and this Coolbaugh wished to avoid.

Not only are these circumstances all in harmony with our theory as to the real truth of this transaction, but there are some circumstances which, if not wholly incompatible with any other theory, at least strongly corroborate our view.

The fact that Smith at first paid the interest on the Libby note, shows that he was in some way interested in the purchase, and the fact that the deed of Libby for this land recites a consideration of $55,000, which agrees with the amount of $22,000 note given Libby added to the amount of $33,000, (representing the original $30,000 debt of Smith

and others, with interest and expenses incurred,) strongly supports the testimony of Smith and· Libby that this claim of the bank was a part of the consideration or price of this land. If this be so, and the purchase was not made for the bank, why was not the amount of this claim charged on the books of the bank against somebody? If Coolbaugh bought for himself, why was it not charged to him? There was no objection to its *appearing* on the bank books that Coolbaugh had personally bought that claim from the bank and used it in a trade for his own use, had that been the truth. The same suggestion is equally pertinent as against the theory of his having made the purchase as a friend of Smith, and as a speculation for Smith.

It is somewhat significant that this deed of Libby to Coolbaugh, with a professional opinion as to the title, was placed by Coolbaugh in a box of the bank in which the title papers of lands of the bank were usually kept, and were found there after his death, in an envelope indorsed in the handwriting of Coolbaugh, "Papers relating to 22 acres of land purchased of Washington Libby, acct. Adam Smith & Co." Coolbaugh personally had no account or dealings with Adam Smith & Co., on account of which it could be said this purchase was made. This clearly indicates that the object of the purchase had relation to some transactions with Adam Smith & Co. The bank, and the bank alone, had had transactions of this character. Another fact in harmony with all the circumstances is, that in making this purchase Coolbaugh sought and obtained the opinion of a lawyer as to the title, and for this opinion the charge was made by the lawyer against the bank, and with other charges against the bank was rendered in an account and paid by the bank, although Coolbaugh had a personal account with the same parties.

All truths are consistent with each other. In an examination of all the proven facts in this case, they can all be reconciled with each other on the theory that this purchase

from Libby was by the bank and for the bank, and they can not be reconciled upon any other hypothesis which has been suggested or which has occurred to us. It is not denied that Coolbaugh bought from Libby, either for the bank or for himself, or for the benefit of Smith. No motive can be found to induce such a purchase for himself as a speculation, at the price of $55,000, when his estimate of the value was $44,000. He is not shown to have had any motive to attempt to serve Smith as a friend in a transaction where the bank was interested against Smith, and the duty of protecting the interests of the bank rested upon him while he owed no duty to Smith; nor can we conceive how Smith could expect to be benefited by a purchase by him at $55,000 of property worth only $44,000. There is a motive, and a laudable one, shown for the purchase by the bank, as we have already shown. It seems to us plain that the bank, in truth, was the purchaser, and as such should pay the unpaid part of the purchase money, and that the estate of Coolbaugh should be held liable only as a security for the bank.

The judgment of the Appellate Court is therefore reversed, and the cause remanded to that court, with directions to that court to reverse the decree of the Superior Court of Cook county, and remand the cause to that court for further proceedings in accord with the views expressed in this opinion.

*Judgment reversed.*

WALKER and SCHOLFIELD, JJ.: We are unable to concur in the decision announced in this case.